IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| WINSTON A. RITTER,<br>Plaintiff,<br>vs.<br>RAY HUNT, ET AL.,<br>Defendants. | CV-24-87-H-DLC<br><br>ORDER |

Pending before the Court are Plaintiff Winston A. Ritter's Motion for Summary Judgment and Defendants Ray Hunt, Paul Rees, Melissa Scharf, Stephany Pasha, Daniel Woydick, Dean Chapel, Jodi Cozby, Amanda Womack, and Alisha Hannah's, collectively, "Defendants", Motion for Summary Judgment. (Docs. 47 and 54.) The motions are fully briefed. Defendants' motion is granted.

## I. BACKGROUND[1]

Ritter arrived at Montana State Prison ("MSP") on February 14, 2024, and has been incarcerated there ever since. (Doc. 49 at 2.) Defendants are all employees in the infirmary at MSP, with the exception of Ray Hunt, who is MSP's dietician.

[1] These basic facts are undisputed unless otherwise noted.

Ritter has suffered from Crohn's Disease since at least 2004. (Doc. 49 at 2.) Crohn's disease is an autoimmune digestive disorder. (Doc. 49-1 at 3.) He has generally preferred to manage his disease over the years with diet rather than medication. He has, however, had various surgeries on his intestines over the years, and has had a colostomy. (Doc. 49-1 at 4.) (Prior to his current incarceration at MSP, Ritter has or has had many serious medical conditions, including colon cancer, renal failure, myocardial infarction, and pulmonary embolism. (Doc. 49-2 at 20.))

Upon arrival at MSP in 2024, Ritter informed MSP employee Shauna Cross that he required a special diet. (Doc. 56 at 2.) On February 28, 2024, Ritter was initially put on a high protein, low carbohydrate diet by Defendant Doctors Woydick and Rees. (Doc. 55-1 at 13.) Ritter picked the diet from a list of different specialized diets that Rees offered him. (Doc. 60 at 3.)

In short order, Ritter was not happy with this diet, because it included some foods that he could not eat. In particular, the diet included many vegetables that were indigestible for Ritter. Ritter sent grievances regarding the diet, and was told, repeatedly, that he had to raise issues related to his diet with the dietician, and not with the medical staff. (Ritter submitted his grievances at Doc. 55-1.) The records submitted by both parties show that Ritter communicated with MSP staff, including Defendant MSP Dietician Ray Hunt, regarding his diet, for months.

During this period, at different times he was removed from the special diet, both by staff and by himself, and then was placed back on it. (Doc. 49 at 2, 4 – 5.) He continued on some form of that diet until he was put on a low fiber diet on November 12, 2024, a form of which he follows today. (Docs. 49 at 5; 55-1 at 118.) That low fiber diet was ordered following a colonoscopy by an outsider provider, due to a stricture in Ritter's intestine that prevented food passage. (Docs. 60 at 3; 49-2 at 1; 49-2 at 5.) That constriction has subsequently been removed by surgery.

Throughout 2024, Ritter had several episodes of abdominal pain that resulted in infirmary stays, emergency room visits, and consultations with outside medical experts. (Doc. 49 at 5 – 8.) Ritter's Crohn's disease is incurable, and he continues to suffer from it. Since his change in diet in November 2024, he has continued to suffer from bowel obstructions, and has had further intestinal surgery.

**II. ANALYSIS**

Defendants filed their timely motion for summary judgment, with supporting documents, on March 6, 2026. (Doc. 47.) Ritter properly sought an extension of time to respond, but then eventually filed a document he captioned "Plaintiff's Motion for Summary Judgment," which was supported by a brief and a Statement of Undisputed Fact ("SUF"). (Docs. 54, 55, and 56.) Defendants objected, stating that Ritter's extension was granted for the purpose of filing a response to their

motion, and not for the purpose of filing his own motion. In the end, Plaintiff's brief has been construed as a response brief, and he subsequently filed an appropriate Statement of Disputed Facts ("SDF"), in response to Defendants' motion. (Doc. 60.) Accordingly, though the docket contains two motions for summary judgment, they have been construed here as Defendant's motion and Plaintiff's response.

**A. Standard for Summary Judgment**

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id*. The Court views the evidence in the light most

favorable to the nonmoving party and draws all justifiable inferences in the non-moving party's favor when deciding a motion for summary judgment. *Id*. at 255 (1986); *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

**B. Eighth Amendment Medical Care**

Incarcerated individuals have a constitutional right to adequate medical treatment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). That right is part of the Eighth Amendment's guarantee against cruel and unusual punishment. *Id.* "[T]o maintain an Eighth Amendment claim based on inadequate medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). This two-pronged test consists of an objective and subjective element. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). The first prong, serious medical need, is objectively shown by demonstrating that "failure to treat the injury . . . could result in further significant injury or cause the unnecessary and wanton infliction of pain." *Id*. (internal quotation marks omitted). The second prong, deliberate indifference, involves a subjective assessment of whether a defendant "knows of and disregards an excessive risk to inmate health or safety." *Id.* (internal quotation marks omitted). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and [] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

The first step of this analysis, the objective element, is undisputed. The parties agree that Ritter's Crohn's Disease creates a serious medical need. The crux of the matter, then, is the second step, whether Defendants were deliberately indifferent to his serious medical need. Each defendant has or has had a different role at MSP and in relation to Ritter. Nevertheless, both parties have treated these individuals in their briefs as though they are one unified actor.

1. Melissa Scharf

Melissa Scharf is barely mentioned in Ritter's Third Amended Complaint. (Doc. 35.) Ritter alleges that, on March 19, 2024, Scharf was behind another defendant, Alisha Hannah's, comment to Ritter that he would be written up for impeding staff if he continued to contact medical. (Doc. 35 at 3 - 4.) Ritter does not allege that Scharf made this comment herself. Scharf also changed a policy regarding diets at some point. (Doc. 35 at 8.) As to deliberate indifference, the sole allegation against Scharf is that she refused "to answer the Plaintiff's pleas to help…" (Doc. 35 at 9.)

Scharf's name likewise appears only a few times in the records provided by the parties, including as the addressee of a copy of Ritter's report from a medical visit, and as the person Ritter believes forced Ray Hunt to come to the infirmary to

talk about Ritter's diet. (Doc. 49-2 at 54, 111; 49-1 at 14, 15, and 36.) Scharf sent an email to staff related to Ritter's special diet being canceled in August of 2024, when he was found to be eating foods off of others' trays, leaving Ritter "to make decisions on his own for what foods he can and cannot eat." (Doc. 25-1 at 3.) Scharf also submitted an affidavit into the record as custodian of MSP medical records. (Doc. 49-3.)

There is no evidence in the record before the Court to establish a dispute regarding Defendant Scharf's conduct that would necessitate a trial. She was aware of his changing diet, and the institution's policy regarding diets, but she was neither in charge of determining Ritter's diet, nor of making medical decisions as a doctor. There is no evidence in the record that Scharf was deliberately indifferent to Ritter's medical need. Scharf is entitled to summary judgment.

2. Stephany Pasha

Ritter's Third Amended Complaint alleges that Stephany Pasha responded to his grievances by stating that food service was in charge of finding foods to fit the special diet, or that Ritter had to choose from the food provided. (Doc. 35 at 4; 7.) Ritter alleges Pasha acted with deliberate indifference when she ignored his symptoms and pleas. (Doc. 35 at 10.)

Pasha appears in the summary judgment record via an email she wrote to various people regarding "a very long conversation" she had with Ritter about his

diet and illness. (Doc. 25-1 at 4 – 5.) In it, she discussed Ritter's difficulty getting his special diet, educating him about the rules related to the diet and his disease, and, ultimately, placing him back on the low carb, high protein diet. She also responded to some of Ritter's grievances. *See, e.g.*, Doc. 55-1 at 121 - 122 (Ritter asks for V8 or Boost as nutritional supplements and Pasha responds "please choose foods from the diet provided").

There is no evidence in the record before the Court to establish a dispute regarding Defendant Pasha's conduct that would necessitate a trial. She was aware of his diet, and discussed with him how he could get the foods he needed, but there is no evidence to support the proposition that she was deliberately indifferent to his needs. Pasha is entitled to summary judgment.

3. Dean Chapel

Dean Chapel is a physician's assistant employed at MSP. Ritter alleges he had a brief visit with Chapel in which Ritter was re-prescribed prednisone, without a change in diet, implying that Chapel did not do for Ritter's disease what Ritter thought was appropriate. (Doc. 35 at 5.) Ritter then generally alleges that Chapel's failure to respond to Ritter's symptoms reflected deliberate indifference. (Doc. 35 at 10.)

Chapel is not otherwise mentioned or discussed in the summary judgment materials. The undisputed evidence in the record reveals no dispute that would

warrant a trial. Even if Chapel chose a less-than-optimal treatment for Ritter, without evidence that he knew it was wrong or insufficient, his actions do not show deliberate indifference. Chapel is entitled to summary judgment.

4. Jodi Cozby

Jody Cozby is a nurse practitioner at MSP. (Doc. 35 at 2.) As alleged in Ritter's Third Amended Complaint, Cozby saw Ritter in the infirmary on June 21, 2024, but "nothing had changed." (Doc. 35 at 6.) Ritter construes Cozby's actions as deliberate indifference. (Doc. 35 at 11.) Cozby rarely appears in the record before the Court. Cozby referred Ritter to Deer Lodge Medical Center for abdominal pain. (Doc. 49 at 7.) She was neither in charge of Ritter's diet nor his medical care. She is entitled to summary judgment.

5. Amanda Womack

Ritter's Third Amended Complaint alleges that Ritter saw Defendant Womack, who is nurse in the MSP infirmary, a couple of times when he entered MSP. (Doc. 35 at 2.) He also saw her twice more during 2024, when she gave him medication for nausea. (Doc. 35 at 6.) Ritter alleges Womack was deliberately indifferent to his serious medical need. (Doc. 35 at 11.) Womack was neither in charge of Ritter's diet nor his medical care. The record shows she was not deliberately indifferent to Ritter's serious medical need. Womack is entitled to summary judgment.

6. Alisha Hannah

Alisha Hannah is a nurse employed at MSP. (Doc. 35 at 2.) Ritter's Third Amended Complaint alleges she made threats to try to stop him from complaining to the infirmary about his illness, yelled at him, and otherwise acted with deliberate indifference to his serious medical need. (Doc. 35 at 11.) Hannah does not otherwise appear in the record. There is no material dispute that would warrant a trial regarding Hannah's alleged deliberate indifference to Ritter's serious medical need. Hannah is entitled to summary judgment.

7. Daniel Woydick and Paul Rees

Defendants Woydick and Rees are doctors at MSP. The undisputed facts in the record show that Defendants Woydick and Rees saw Ritter several times in the infirmary, provided him medication for his intestinal pain, referred him to outside providers for emergency care for abdominal pain and expert care for his Crohn's, and attempted to use a recommended biologic drug treatment for Ritter's Crohn's. (Doc. 49 at 5 – 9.) Ritter does not dispute that he received this medical care; he occasionally disputes the usefulness of the care, and he provides additional context for some of the care or clarification of his own prior statements. (Doc. 60 at 10 – 15.)

Woydick and Rees were not deliberately indifferent to Ritter's serious medical need. Ritter's assertion, throughout this suit, is that Defendants should

have ordered him a specific diet, and their failure to do so evinced deliberate indifference to his Crohn's. The record shows that when it came to diet, Defendants Woydick and Rees told Ritter to speak to the dietician. (Doc. 56 at 5.) For what they considered within their purview, i.e., to treat him medically, they did not exhibit deliberate indifference. Ritter timely saw outside providers, none of whom recommended a special diet until November, 2024. (*See, e.g.*, Doc. 49-2 at 20 - 28; 32 – 35; 57 – 58; 98 - 105.) Likewise, he was seen and treated frequently in the infirmary for nausea, check-ups, and abdominal pain. To the extent Ritter asserts that these Defendants should have known that Ritter's diet was improper or insufficient, that assertion does not amount to deliberate indifference. Medical malpractice alone is not sufficient to state a constitutional claim. *Simmons v. G. Arnett*, 47 F.4th 927, 933–34 (9th Cir. 2022); *Estelle*, 429 U.S. at 106. Defendants Woydick and Rees were responsive to Ritter's medical issues, even if Ritter believes they could have done more or better. Ritter's claim fails on the subjective prong of the Eighth Amendment test. Woydick and Rees are entitled to summary judgment.

8. Ray Hunt

Dietician Ray Hunt is at the center of Ritter's allegations, because, as stated above, Ritter believes the diet he received at MSP is responsible for "irreparable harm" to his intestines. Ritter's complaints about his diet were routinely referred to

Hunt by the other defendants, regardless of their role at MSP. Hunt was responsible for the design of the high protein/low carb diet that Ritter was on for months, presumably, but Ritter has not established that Hunt was deliberately indifferent to Ritter's serious medical need, construed as providing a specific diet.

Ritter initially chose the high protein, low carb diet upon arrival at MSP, apparently not understanding that it would not work for him. (Doc. 55-2 at 11; 21.) At that time, Ray Hunt wrote to Ritter explaining that he could provide aid in "selecting foods for self-treatment of Crohn's disease." (Doc. 55-1 at 3.) The letter from Hunt was written prior to Rees' order for a special diet, and discusses Ritter's prior time at MSP, and how he was able to manage his diet by choosing from the items available to everyone. *Id.* Ritter's dietary requirements have evolved over time. Foods he used to be able to eat, such as carrots and green beans, he no longer can. (Doc. 49-1 at 10 - 13.) Ritter characterizes these changes over time as "get[ting] worse." (Doc. 49-1 at 10.) Ritter also continues to suffer from bowel obstructions, and he continues to wonder how to adjust his diet to improve that situation. (Doc. 49-1 at 13.)

Ritter was put on the high protein, low carb diet and then taken off of it a few times. He was taken off for trading foods with other people, and then he just ate, or did not, the regular foods for two months. At one point he took himself off the diet because it contained too many vegetables that he could not eat. (Doc. 55-1

at 52.) Then he went back on it, until being put on the low fiber diet in November, 2024.

The overarching picture of Ritter's situation with Hunt is a failure of communication. The record shows that during the time when he was on the high protein diet, his ability to communicate about what, exactly, he wanted, was not effective. He wrote lengthy grievances detailing his medical history and speaking in generalities about his diet, including lists of things he cannot eat, but he does not state that he does not want to be on the high protein diet. (*See, e.g.*, Doc. 55-1 at 7 – 8 (March 7, 2024).)

The clearest timeline of Ritter's communications with Hunt is found in a document created by Hunt and attached to Ritter's brief. (Doc. 55-1 at 29- 30.) This document reveals the miscommunication between Hunt and Ritter. Hunt says, "Apparently, Ritter believes that cinnamon rolls are ok to include on his low carb diet." (Doc. 55-1 at 29.) Based on what Ritter has said about calories and fiber, a cinnamon roll without raisins and with white flour may be just fine for him. But it is not low carb, making it seem to Hunt as inappropriate for a medically-ordered low carb diet. As of a July 2024 email, Hunt was expressing the view that "if what ritter is reporting to me and [others] is true, then it seems it may be important to reevaluate his medical diet order." (Doc. 55-1 at 35.) The record establishes that Hunt was responsive, especially the longer Ritter was there, but that he did not

initially understand that the diet Ritter himself chose upon entry to MSP was not the best option for Ritter.

Ritter and Hunt clearly disagreed about whether Ritter needed a special diet, or if he could exist fine on the diet provided to everyone. Ritter was able to avoid the foods he knew he should not eat, at the risk of not having enough to eat. Hunt was convinced that Ritter could get sufficient foods from the regular menu by selecting carefully. (Doc. 55-1 at 5 (April 3, 2024).) The grievances that Ritter wrote directly to Hunt show he attempted to explain to him which foods he could not eat, and to explain his background with his illness. (Doc. 55-1 at 7 - 8.) Ritter attempted to explain to Hunt what he could and could not eat, more than once, and expressed that he understood accommodating his diet might be difficult. (Doc. 55-1 at 10.) Ritter told others that Hunt was not modifying the diet based on Ritter's input. (Doc. 55-1 at 13.) But Ritter's grievances did not always convey his problem. For example, on April 6, 2024, he wrote:

> Up until the morning of March 5th, I was receiving a diet of high protein and low carbs. What I was receiving was 6 2 oz. cups of peanut butter that I was using to compensate for the food on the trays that I cannot digest/consume without causing irreparable harm to my intestinal system, which is delicate enough, only having between ¼ and 1/3 left after two major surgeries! I believe me eating breakfast on the 5th is why I had a flare up. However when inquiring with nurse Hannah, the Provider Chaplin, and other nurses, I don't have names for, no one can give me an explanation for what is going on, nor can communicate in any way to give me any direction regarding what to expect.

(Doc. 55-1 at 15.) He then goes on to request reinstatement of the "Band-Aid" diet until things can be figured out. Ray responds that Ritter will be put back on the diet. The substance of Ritter's grievance does not make clear what he is complaining about, and whether he is saying that the high protein/low carb diet was okay, with the addition of peanut butter. Such difficulties in communication, and changing behavior regarding his special diet, marks Ritter's discussions of his diet with staff. (*See, e.g.*, Doc. 55-1 at 21; 43 - 44.) Confusion among the staff about whether he wanted his high protein, low carb diet persisted. (Doc. 55-1 at 34; 46.) Nowhere in the grievances supplied in the record does Ritter ask for a low fiber diet; he says a lot of things are inedible to him, but he does not say he needs a no fiber diet.

Once Ritter was put on a low fiber diet by an outside provider, in November 2024, Hunt met with him to try to remove any vegetables that Ritter could not eat. (Doc. 49-1 at 17.) He began to puree carrots, and Ritter characterized Hunt as "trying to make an effort," though Ritter considered the effort insufficient. (Doc. 49-1 at 17.) At some point, Defendant Scharf called Defendant Hunt to the infirmary to go through a list of foods item by item so Hunt could cross off the things that Ritter cannot eat. (Doc. 49-1 at 15.) When this occurred is unclear, but it was after an emergency surgery, and may have been in May 2025.

The record shows a clear failure of communication between Ritter and Hunt, and, quite possibly, Hunt's failure to understand what Ritter actually needed. But that is not the standard for an Eighth Amendment constitutional violation. The standard is whether Hunt knew there was a risk to Ritter's health and chose to ignore it. In sum, Ritter did not get the response to his grievances that he hoped for, but the record establishes that Hunt was not deliberately indifferent to Ritter's serious medical need. Hunt is entitled to summary judgment.

## IV. CONCLUSION

The undisputed record in this matter establishes that, while Ritter struggled to achieve a diet at MSP that fit perfectly with his ideal diet to treat his Crohn's disease, none of the defendants was deliberately indifferent to his needs. Summary judgment is granted to Defendants.

Accordingly, it is HEREBY ORDERED:

1. Defendants' motion for summary judgment is **GRANTED**. (Doc. 47.) The Clerk of Court is directed to enter judgment pursuant to Fed. R. Civ. P. 58.

2. All pending motions are denied as moot.

3. The Court certifies that appeal would not be taken in good faith.

DATED this 28th day of October, 2026.

Dana L. Christensen, District Judge
United States District Court